1  William C. Jeanney, Esq.
   Nevada Bar No. 1235
2  **BRADLEY, DRENDEL, & JEANNEY**
   6900 S. McCarran Boulevard, Suite 2000
3  Reno, Nevada 89509
   Telephone:    (775) 335-9999
4  Facsimile:    (775) 335-9993

5  Robert E. Ammons, Esq. *(pro hac vice to be filed)*
   Texas Bar No. 01159820
6  Adam Milasincic, Esq. *(pro hac vice to be filed)*
   Texas Bar No. 24079001
7  **THE AMMONS LAW FIRM, LLP**
   3700 Montrose Boulevard
8  Houston, Texas 77006
   Telephone:    (713) 523-1606
9  Facsimile:    (713) 523-4159
   *Attorneys for Plaintiffs*

10
                    **UNITED STATES DISTRICT COURT**
11                     **DISTRICT OF NEVADA**

12  ROSALBA M. AGUILAR, Surviving Spouse of
    Luis Aguilar Hurtado, Deceased, and Guardian
13  of SOPHIA AGUILAR, Surviving Minor
    Daughter of Luis Aguilar Hurtado, Deceased;
14  EMILY AGUILAR, MELODY AGUILAR,                    CASE NO.
    and JESSICA AGUILAR, Surviving Adult
15  Daughters of Luis Aguilar Hurtado, Deceased;
    and VICTOR AGUILAR, LUIS GONZALO
16  AGUILAR, and SERGIO AGUILAR, Surviving
    Adult Sons of Luis Aguilar Hurtado, Deceased,
17
                                        Plaintiffs,
18
    vs.
19
    FORD MOTOR COMPANY and DOES ONE
20  through TWENTY, inclusive,

21                                      Defendants.

22  ///

23  ///

24

*Complaint*                                          Page **1** of 17

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiffs ROSALBA M. AGUILAR, Surviving Spouse of Luis Aguilar Hurtado, Deceased, and Guardian of SOPHIA AGUILAR, Surviving Minor Daughter of Luis Aguilar Hurtado, Deceased; EMILY AGUILAR, MELODY AGUILAR, and JESSICA AGUILAR, Surviving Adult Daughters of Luis Aguilar Hurtado, Deceased; and VICTOR AGUILAR, LUIS GONZALO AGUILAR, and SERGIO AGUILAR, Surviving Adult Sons of Luis Aguilar Hurtado, Deceased, ("Plaintiffs") bring this action against FORD MOTOR COMPANY and DOES ONE through TWENTY (collectively "Defendants"), and allege as follows:

## I. PARTIES, VENUE AND JURISDICTION

1.      Does One through Twenty, inclusive, and each of them, are sued herein by fictitious names because their true names and capacities, whether individual, associate, corporate, or governmental, are not now known to Plaintiffs. Plaintiffs will ask for leave to insert herein the true names and capacities of such Defendants when the same are ascertained. Plaintiffs are informed and believe and upon such information and belief alleges that each of the Doe Defendants, which include but are not limited to those providing automotive services, are legally responsible and liable for the injuries and damages hereinafter set forth, by reason of strict product liability. Plaintiffs will ask leave to amend this Complaint to insert their true names and capacities and further charging allegations once such facts are ascertained.

2.      At all times mentioned herein, Defendants and Does One through Twenty, inclusive, and each of them, were agents, servants and employees of each and the other, and were engaged in the course and scope of such agency and employment. In doing the acts herein alleged, each Defendant and Doe was acting with the consent, permission, advance knowledge and authorization

of each of the other Defendants and Does, and all of such acts were ratified and approved by the officers or managing agents of each and every other Defendant and Doe.

3.    Plaintiffs Rosalba M. Aguilar, Surviving Spouse of Luis Aguilar Hurtado, Deceased, and Guardian of Sophia Aguilar, Surviving Minor Daughter of Luis Aguilar Hurtado, Deceased, Emily Aguilar and Melody Aguilar, Surviving Adult Daughters of Luis Aguilar Hurtado, Deceased, are residents of the State of Nevada. Plaintiffs Rosalba M. Aguilar, Emily Aguilar, and Melody Aguilar are adult citizens of the United States and citizens of the State of Nevada. Sophia Aguilar is a minor citizen of the United States and a citizen of the State of Nevada.

4.    Plaintiffs Jessica Aguilar, Surviving Adult Daughter of Luis Aguilar Hurtado, Deceased, Victor Aguilar, Luis Gonzalo Aguilar, and Sergio Aguilar, Surviving Adult Sons of Luis Aguilar Hurtado, Deceased, are residents of the State of California. Plaintiffs Jessica Aguilar, Victor Aguilar, Luis Gonzalo Aguilar, and Sergio Aguilar are adult citizens of the United States and citizens of the State of California.

5.    At all times mentioned herein, Defendant Ford Motor Company (hereinafter referred to as "Ford") was a Delaware corporation with its principal place of business in Dearborn, Michigan, authorized to do business in the state of Nevada. Ford Motor Company was and is in the business of designing, developing, testing, manufacturing, selling, distributing and otherwise placing into the stream of commerce motor vehicles for use by the consuming public. Service of process can be made on Ford through its registered agent, C T Corporation System, 701 S. Carson Street, Suite 200, Carson City, Nevada 89701.

6.    The named Defendants are sued jointly and severally.

7.    The death of Luis Aguilar Hurtado and the injuries to all other Plaintiffs for the reasons stated in this Complaint took place in the State of Nevada. Although all Defendants do business in

*Complaint*

the State of Nevada, none of the Defendants are residents of the State in that none of the Defendants are Nevada corporations or maintain their principal place of business in the State of Nevada. Accordingly, venue is proper in any county which the Plaintiffs may designate in the Complaint under Nevada Revised Civil Statutes § 13.040. Accordingly, venue for this action is proper as designated in Washoe County, Nevada.

8.      Ford purposefully avails itself of the Nevada market for pickup trucks.

9.      Ford pays for billboards, TV and radio spots, print ads, and direct mail urging Nevadans to buy its vehicles, including the F-250 pickup truck.

10.      In or before 2001, Ford began paying for billboards, TV and radio spots, print ads, and direct mail urging Nevadans to buy its vehicles, including the F-250 pickup truck.

11.      Ford F-250 pickup trucks are available for sale, whether new or used, at Ford-authorized dealerships in Nevada.

12.      Ford's dealers in Nevada regularly maintain and repair Ford cars, including F-250s.

13.      Ford serves a market for pickup trucks, including the F-250, in Nevada.

14.      Ford distributes replacement parts to its own dealers in Nevada and to independent aut shops in Nevada.

15.      The crash at issue occurred in Nevada while Luis Aguilar Hurtado was driving a Ford F-250 pickup truck.

16.      Luis Aguilar Hurtado was killed in the crash at issue.

17.      Personal jurisdiction is proper as to all of the Defendants under the provisions of Nevada Revised Civil Statutes § 14.080 in that the Plaintiffs suffered injury or death as the result of a product or product more specifically described herein that was manufactured, produced, made, marketed, or otherwise supplied directly or indirectly for distribution, sale or use in the State of

Nevada. Since the injuries and death directly arose out of the use of products in the State of Nevada, specific personal jurisdiction is established as to each of the Defendants.

## II. FACTS COMMON TO ALL CAUSES OF ACTION

18.     Defendant Ford designed the 2001 Ford F-250 bearing VIN# 1FTNX20L31EC56547, which is the subject of this lawsuit (hereinafter referred to as "the subject F-250").

19.     Ford manufactured the subject F-250.

20.     Ford marketed the subject F-250.

21.     Ford sold the subject F-250 to an authorized Ford dealership.

22.     Defendant Ford knew about crashworthiness.

23.     Crashworthiness is the science of minimizing the risk of serious injury and fatality in motor vehicle collisions through the use of safety systems.

24.     Crashworthiness requires that an auto manufacturer design its vehicles in such a way that when a crash occurs, injuries to the people inside the vehicle are minimized to the extent practical.

25.     Because the subject F-250 was equipped with a defective and unreasonably dangerous roof structure and restraint system, the vehicle was uncrashworthy.

26.     When a vehicle is not crashworthy, it means that people suffer injuries that could have been prevented.

27.     While rollovers represent a small (but rising) number of total crashes, they are the biggest killers in light trucks and SUVs.

28.     Injuries in rollovers can result from roof crush into the occupant's survival space, leading to an occupant's "second" collision with structures and components within the vehicle.

29.    The forces generated by most rollovers are well within human tolerance if the occupant is properly restrained and the roof does not crush significantly into the occupant compartment.

30.    Rollovers become dangerous when defects in the vehicle – for instance, weak roofs or ineffective restraints – place the occupant at risk.

31.    A July 8, 1968 memo from Ford's Automotive Safety Research Office (the "Memo") states that "Roof instruction may have a more pronounced effect on occupant injuries with increased usage of upper torso restraints."

32.    The Memo also states that "People are injured by roof collapse. The total number of nationwide deaths and injuries cannot be estimated but it is a significant number."

33.    The Memo further states that "It seems unjust to penalize people wearing effective seatbelt restraint systems by exposing them to more severe rollover injuries than they might expect with no restraints."

34.    In hearings before the U.S. Senate, Ford President Arjay Miller testified that: "We have been contributing to the Cornell crash study program since 1955. This is the only source of mass statistics on injuries resulting from auto accidents, and we make extensive use of the data."

35.    One observation from the Cornell program known as the Automotive Crash Injury Research Committee ("ACIR") was: "This Research Center has gathered injury data which freely demonstrates that approximately 19% of all injury-producing accidents involve a roll-over type accident. Crushing of the top structure is also a serious problem as this effectively destroys the package compartment, leaving no room for the occupant."

36.    Ford is capable of making roofs that are strong and maintain their integrity in rollovers.

37.     On March 21, 2001, Ford VP of Environmental and Safety Engineering Helen Petrauskas testified that "We have a moral obligation to do those things that are feasible and practical to reduce the risk of injury and death to customers."

38.     On May 23, 2006, Ford engineer Thomas Patterson testified that "The technology's always been available to build as rigid a roof structure as you want."

39.     The subject F-250 is not designed in such a way that injuries to its occupants are minimized during foreseeable rollover crashes.

40.     Because the roof of the 2001 F-250 is not strong enough to support the weight of the vehicle, it collapses into occupants' survival space.

41.     The following technologically and economically feasible methods are and have been available to Ford to improve the roof strength of all of its vehicles, including F-250s:

- Using closed structural sections in place of weak, shallow-tray open sections;
- Increasing metal gauge;
- Replacing low-strength steel with high-strength steel (e.g., Boron steel is five times stronger than conventional steel);
- Reinforcing component voids with structural foam;
- Increasing section size;
- Implementing internal reinforcements;
- Eliminating holes; and
- Improving component integration.

42.     Ford failed to exercise sound engineering judgment in its design of the subject F-250's roof. Instead of using available safety technology to ensure it was safe in a rollover, Ford chose only to comply with minimum requirements.

43.     Ford's choice was made consciously and in an effort to avoid the time, money and effort necessary to strengthen the roof to withstand the foreseeable forces of real-world rollovers.

44.     Ford was also negligent in failing to test the subject F-250's injury prevention and occupant protection capabilities through dynamic rollover testing, which would provide performance data on how the roof structure and restraints perform under real-world conditions.

45.     On December 12, 2020, Decedent Luis Aguilar Hurtado was driving the subject F-250 in Churchill County, Nevada.

46.     The subject F-250 rolled over passenger side and came to rest on its roof.

47.     The roof on the subject F-250 collapsed in the crash.



48.     As a result of the roof deformation, Luis Aguilar Hurtado was pronounced deceased at the scene.

49.     In the autopsy report, it was found that Decedent suffered diffuse subscapular, subgaleal, and bilateral temporalis muscle hemorrhages; a subarachnoid hemorrhage; and fractures of the vertebra; all injuries consistent with contact with the roof structure as it deformed downward into the occupant's survival space during the rollover.

50.     Ford's roof and rollover protection systems for the subject F-250 failed to:

a.      Limit the head excursion towards the roof;

        b.      Prevent roof/headliner distortion capable of pocketing the head; and
        c.      Prevent roof intrusion into the survival space.

        51.     Had the subject F-250 been equipped with a stronger roof and effective rollover restraint, Decedent would have walked away from the subject incident.

        52.     The fatal injuries to Luis Aguilar Hurtado occurred because the F-250's roof and rollover protection system were defective. Decedent's safety was severely compromised by the poor performance of the F-250's roof structure in the rollover at issue.

        53.     As a legal consequence of the subject rollover, for which Defendants and each of them are liable, and the wrongful death of Decedent, Plaintiffs have suffered the loss of Decedent's probable support, companionship, society, comfort and consortium, and have suffered their own grief and sorrow. In addition, Plaintiffs have the right to recover damages for the pain, suffering, and/or disfigurement of the Decedent. Plaintiffs seek such damages in an amount in excess of the minimum jurisdictional amount for this court, subject to proof at trial.

**FIRST CAUSE OF ACTION**
**(Strict Liability Against Ford Motor Company and the Doe Defendants)**

        As a first, separate and distinct cause of action, Plaintiffs complain of Ford Motor Company and Does One through Twenty, inclusive, and each of them and alleges:

        54.     Plaintiffs reallege paragraphs 1 through 41 as if herein set forth verbatim.

        55.     The 2001 Ford F-250 manufactured and sold by Ford Motor Company was unreasonably dangerous and unsafe for its intended use by reason of defects.

        56.     At all times material to this action, Ford was in the business of designing, testing, approving, manufacturing, marketing, distributing and selling motor vehicles, including the subject F-250, for use in Nevada and elsewhere throughout the United States.

*Complaint*                                                              Page **9** of 17

57.     At the time the subject F-250 left the control of Ford, it was defective and unreasonably dangerous to a person who might reasonably be expected to use it. These defects include, but are not limited to, the conditions described in the following paragraphs.

58.     The subject F-250 was uncrashworthy in its design and manufacture.

59.     The subject F-250 lacked adequate and sufficient warnings and instructions about the risks, dangers and harms presented by the subject F-250 and reasonable means to reduce such risks, dangers and harms.

60.     The subject F-250's roof structure design and rollover occupant protection system was defective and it failed to provide reasonable occupant protection in the event of a rollover crash.

61.     The subject F-250's roof structure was inadequate to protect occupants from foreseeable crash forces because its roof structure does not have the strength necessary to maintain the integrity of the occupant compartment or safety cell and preserve the occupant's survival space.

62.     The subject F-250's roof structure and seat belt restraint design failed to incorporate designs and technologies which would have increased the likelihood that adequate occupant protection would be provided in  foreseeable crashes like rollovers.

63.     When the subject F-250 left the control of Defendant Ford, there were safer alternative roof structure designs and rollover occupant protection systems other than those of the F-250.

64.     The safer alternative designs would have either prevented or significantly reduced the risk of the occurrence, fatal injuries and damages without substantially impairing the vehicle's utility, and the safer alternative designs were economically and technologically feasible at all times relevant.

65.     The design of the vehicle was defective and unreasonably dangerous because the vehicle's roof structure and occupant restraint failed to offer proper occupant protection in foreseeable rollover events.

66.     Ford improperly and inadequately tested the F-250 for occupant crash safety.

67.     Ford knew or should have known of a potential risk of harm presented by the defective design of the F-250, but negligently marketed the F-250 with the design and marketing defects.

68.     The F-250 posed a risk of harm for the intended or reasonably anticipated use.

69.     Ford knew or should have reasonably foreseen the risk of harm at the time the F-250 was sold, and that the product possessed a marketing defect.

70.     The absence of proper warnings and/or instructions rendered the product unreasonably dangerous to the user of the product.

71.     Ford's failure to warn or instruct of the danger posed by the F-250 was a proximate and producing cause of Plaintiff's injuries and damages.

72.     Plaintiffs further claim, in the alternative, that a manufacturing defect was a producing cause of her personal injuries and provides notice of her intention to rely upon the Malfunction Doctrine (also known as the Malfunction Theory) as set forth in RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 3 (1998). In this instance, it may be inferred that the severe and permanent injuries sustained by Plaintiff were caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, because the injuries suffered by Decedent: (a) were of the kind that ordinarily occur as a result of a product defect; and (b) were not, in the particular case, solely the result of causes other than the product defect existing at the time of the sale or distribution.

73.     The subject F-250 was expected by Ford to reach, and did reach, the user or consumer without substantial change to the condition in which it was sold.

*Complaint*                                                                 Page **11** of 17

74.     Decedent Luis Aguilar Hurtado was a person who was reasonably expected to use the subject F-250, and it was foreseeable that the subject F-250 would be involved in a rollover crash or any other crash event.

75.     The death of Luis Aguilar Hurtado and Plaintiffs' damages described in this Complaint were as a direct and proximate result of the defective subject F-250 for which Ford Motor Company and Does One through Twenty, inclusive, and each of them, are strictly liable and for which Plaintiffs seek judgment as set out below.

## SECOND CAUSE OF ACTION
### (Negligence Against Ford Motor Company and the Doe Defendants)

As a second, separate and distinct cause of action, Plaintiffs complain of Ford Motor Company and Does One through Twenty, inclusive, and each of them and alleges:

76.     Plaintiffs reallege paragraphs 1 through 75 as if herein set forth verbatim.

77.     At all relevant times, Ford owed a legal duty to consumers, including Decedent, to exercise reasonable care in designing, manufacturing, assembling, testing, marketing and selling the F-250 to be crashworthy and free of defects and that would present an unreasonable degree of potential harm or danger to others.

78.     The subject F-250, as sold by Defendant Ford Motor Company, was in a defective condition and was unreasonably dangerous as designed, manufactured and marketed, taking into consideration the utility of the subject F-250 and the risk involved in its use.

79.     The fatal injuries suffered by Luis Aguilar Hurtado and damages suffered by Plaintiffs were proximately caused by the negligence of Defendant Ford in designing, manufacturing, assembling, marketing and selling the subject F-250 involved in the incident made the basis of this lawsuit. Defendant Ford was also negligent in failing to adequately test or inspect the subject F-250.

80.   Defendant Ford was negligent in many ways, including, but not limited to, designing, manufacturing and selling a vehicle that offers inadequate roof structure and occupant restraint in foreseeable rollover incidents. Defendant Ford's negligence was a proximate cause of the fatal injuries to Decedent and damages to Plaintiffs.

81.   The negligence of Ford, including its employees, managers, vice-presidents and executives in the course and scope of their employment includes, but is not limited to, the following acts and/or omissions regarding the safety of the F-250:

a.   Failing to adequately warn consumers of the dangerous condition of the F-250 as described more fully herein;

b.   Failing to provide the consumers with a roof structure and rollover occupant protection system that is adequate to provide protection and injury prevention in foreseeable situations like this one;

c.   Failing to properly and adequately perform tests to assess the F-250's performance and effectiveness in foreseeable situations like this one;

d.   Choosing to disregard and ignore generally accepted principles of hazard control ("design, guard and warn") as well as its obligation to hold the safety of the public paramount;

e.   Choosing to disregard principles of Engineering Ethics and Safety in Design as described in SAE and engineering literature;

f.   Choosing to ignore and/or failing to properly investigate past consumer complaints and/or notices of safety issues and/or defects;

g.   Failing to undertake appropriate system failure analysis and/or root cause analysis when information about adverse events involving the F-250 and other F-series trucks became available to the public and/or known to Ford; and

h.   Failing to properly incorporate the principles of product safety management into the design, development, manufacture, marketing, and sale of the F-250.

82.   Defendant Ford was also negligent in failing to adequately test the F-250 and its roof structure and rollover occupant protection system to see how they would perform in rollover crashes.

*Complaint*                                                                 Page **13** of 17

83.    This is not the first time the roof of a Ford been crushed in a rollover, resulting in serious injuries or death to a perfectly innocent Ford owner or passenger.

84.    Companies that genuinely care about safety will undertake a fair and thorough investigation and root cause analysis of each product failure event.

85.    For many years before the F-250 at issue was manufactured, the list of serious injuries and deaths in Ford vehicles continued to rise as Ford owners and passengers continued to experience enhanced injuries due to roof crush injuries in rollovers.

86.    For years, Ford did nothing to stop enhanced injuries due to roof crush from happening again and again.

87.    Ford did not undertake an objective, root cause analysis of prior roof crush failure incidents involving its vehicles.

88.    Each failure to undertake a proper root cause analysis of each reported roof crush failure involving vehicles manufactured by Ford was a separate act of negligence.

89.    This negligent conduct by Ford was a proximate cause of the injuries to the Decedent.

90.    A proper and thorough root cause analysis of prior roof crush failures in Ford vehicles should have prompted engineers and safety conscious individuals within Ford to insist that the roofs and rollover occupant protection systems be fortified to stop the same types of fatal and serious injuries from happening again and again.

91.    The obligation to learn from mistakes and analyze past failures is a duty that engineers and technical employees within an auto maker owe to customers and the public.

92.    The duty described in the immediately preceding paragraph was breached by Ford before the manufacture of the F-250 at issue. Ford's breach of the aforementioned duty was a proximate cause of the Plaintiff's injuries.

93.     Ford's negligent conduct was attributable to its employees and/or agents who, at all times relevant, were acting within the course, purpose and scope of their employment and/or agency, and with the authority, consent, approval and ratification of Defendant.

94.     As a direct and proximate result of the negligence of Defendant Ford, Luis Aguilar Hurtado suffered fatal injuries, and Plaintiffs have been damaged.

95.     Luis Aguilar Hurtado's fatal injuries and Plaintiffs' damages described in this Complaint were as a direct and proximate result of the above-described defective product (the subject F-250) manufactured by Ford Motor Company for which for which Ford Motor Company and Does One through Twenty, inclusive, and each of them, are strictly liable and for which Plaintiffs seek judgment as set out below.

96.     Ford acted with conscious disregard, i.e., with knowledge of the probable harmful consequences of its wrongful acts and a willful and deliberate failure to act to avoid those consequences. Therefore, Plaintiffs may seek an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Wrongful Death Against Ford Motor Company and the Doe Defendants)**

As a third, separate and distinct cause of action, Plaintiffs complain of Ford Motor Company and Does One through Twenty, inclusive, and each of them and alleges:

97.     Plaintiffs reallege paragraphs 1 through 59 as if herein set forth verbatim.

98.     Plaintiffs are heirs of Luis Aguilar Hurtado as that term is defined under Nevada Revised Civil Statutes § 41.085 and therefore maintain an action for damages against Defendants.

99.     As a result of the injuries to and death of Luis Aguilar Hurtado, Plaintiffs are entitled to: damages for grief, sorrow, support, companionship, society, comfort, and consortium, loss of probable financial support, as well as for damages for the pain, suffering, and/or disfigurement of the Decedent. In addition, Plaintiffs are entitled to recover exemplary damages.

### III. EXEMPTION FROM ARBITRATION AND
### STATEMENT REGARDING RIGHT TO TRIAL BY JURY

100.    Because the case seeks damages in excess of $50,000, this case is exempt from the arbitration program as set forth in the Nevada Rules. Concurrent with this pleading, Plaintiffs seek exemption from arbitration and right to trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, expressly reserving the right to amend this Complaint to include all items of damages not yet ascertained, prays for judgment in their favor and against Defendants, and each of them, jointly and severally, as follows:

1.    For general and special damages each in a sum in excess of Ten Thousand Dollars ($10,000.00);

2.    For all pure economic loss in a sum in excess of Ten Thousand Dollars ($10,000.00);

2.    For attorney's fees and costs of suit incurred herein;

3.    For pre-judgment and post-judgment interest, as allowed by law; and

4.    For such other and further relief as is appropriate under the circumstances.

///
///
///
///
///
///
///
///
///

*Complaint*

1

DATED this ____ day of August, 2021.

2

3

By: _____

4

William C. Jeanney, Esq.
Nevada Bar No. 1235

5

**BRADLEY, DRENDEL, & JEANNEY**
6900 S. McCarran Boulevard, Suite 2000
Reno, Nevada 89509

6

Telephone:     (775) 335-9999
Facsimile:     (775) 335-9993

7

E-mail:     wcjeanney@bdjlaw.com

8

Robert E. Ammons, Esq. *(pro hac vice to be filed)*
Texas Bar No. 01159820

9

Adam Milasincic, Esq. *(pro hac vice to be filed)*
Texas Bar No. 24079001

10

**THE AMMONS LAW FIRM, LLP**
3700 Montrose Boulevard

11

Houston, Texas 77006

12

Telephone:     (713) 523-1606
Facsimile:     (713) 523-4159
E-mail:     rob@ammonslaw.com

13

E-mail:     adam@ammonslaw.com
E-mail:     melanie@ammonslaw.com

14

*Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

*Complaint*                                                                   Page **17** of 17